**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LINDLEY THELISMOND | : | |
| | : | |
| Appellant | : | No. 869 MDA 2025 |

Appeal from the Judgment of Sentence Entered February 27, 2023
In the Court of Common Pleas of Lebanon County
Criminal Division at No(s): CP-38-CR-0000539-2019

BEFORE: BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BOWES, J.:        **FILED: JUNE 18, 2026**

Lindley Thelismond appeals from the judgment of sentence of a term of imprisonment of fifty years to life following his conviction for first-degree murder. We affirm.

The trial court provided an extensive, detailed description of the facts underlying Appellant's conviction, supported by the certified record, which we need not restate herein. *See* Trial Court Opinion, 8/22/25, at 3-17. Succinctly, on the night of February 27, 2019, seventeen-year-old Appellant went to visit fellow Crips gang member Richard Andino. Another member of the Crips, James Jeter, joined them. Appellant and Jeter discovered they were both from Brooklyn, then got into an argument which started by Appellant becoming defensive and ended with Appellant shooting Jeter three times and fleeing out a back alley, where Appellant discarded his jacket along with the

murder weapon and other firearms. Andino called 911, but Jeter was declared dead at the scene after failed attempts to resuscitate him, as one of the bullets went through his lung and heart. Appellant was arrested shortly thereafter.

At Appellant's subsequent trial,[1] the Commonwealth offered, *inter alia*, the testimony of eyewitness Andino, forensic evidence pointing to Appellant as the shooter, physical evidence obtained from a search of Appellant's bedroom, a recording in which Appellant apologized to Andino, and a video depicting Appellant wearing the jacket recovered from the alley. The jury found Appellant guilty of murder in the first degree, and the trial court subsequently sentenced him as indicated above. This appeal followed.[2]

Appellant presents the following questions to this Court:

1. Whether the trial court erred in denying [Appellant]'s motion for a new trial on the basis that the Commonwealth failed to present sufficient evidence that [Appellant] formed and held

_____

[1] The trial did not occur until June 2022, as the trial court had granted a pretrial motion precluding the Commonwealth from offering evidence of Appellant's gang affiliation and the Commonwealth filed an interlocutory appeal to this Court. We vacated and remanded for the court to consider whether the evidence was admissible pursuant to the *res gestae* doctrine. **See Commonwealth v. Thelismond**, 273 A.3d 1054, 2022 WL 443368 (Pa.Super. 2022) (non-precedential decision). The court ultimately ruled in favor of the Commonwealth on the issue, allowing it to present some of the evidence at trial.

[2] Appellant's initial appeal, taken following the denial of his post-sentence motions, was dismissed on December 29, 2023, for the failure of Appellant to file a brief. This appeal followed the reinstatement of his direct appeal rights. Appellant *sua sponte* filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal along with his notice of appeal, and the trial court prepared a responsive Rule 1925(a) opinion.

a specific intent to kill to support the jury's verdict of guilty for first-degree homicide?

2. Whether the trial court erred by denying [Appellant]'s motion for a new trial on the basis that the jury's verdict of guilty was against the weight of the evidence where the individual found by police in possession of the relevant firearm tested positive for gunshot residue and was not eliminated by DNA testing, and [Appellant]'s hands did not test positive for gunshot residue and the same swab used to test for DNA on the firearm was used on multiple parts of the firearm?

3. Whether the trial court erred by denying [Appellant]'s pre-trial motion to suppress evidence recovered from his bedroom without a warrant?

4. Whether the trial court erred by denying [Appellant]'s motion to dismiss under Pa.R.Crim.P. 600 without first providing [Appellant] a hearing as required under that rule?

5. Whether the trial court erred by denying [Appellant]'s motion *in limine* and admitted evidence of [his] gang affiliation and ties to New York City?

6. Whether the trial court erred by overruling [Appellant]'s objection to the admission and publication of video depicting [him] holding large sums of money?

7. Whether the trial court erred in crafting a sentence in this matter by not considering the requisite statutory matters of the lack of criminal sophistication of the crime as well as [Appellant]'s age, mental capacity, and lack of juvenile delinquency?

Appellant's brief at 6 (unnecessary capitalization omitted).

The following legal principles apply to our review of Appellant's claims.

As to Appellant's sufficiency challenge, we bear in mind:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence,

we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Palmer***, 192 A.3d 85, 89 (Pa.Super. 2018) (cleaned up).

Appellant's contention that the verdict was against the weight of the evidence is governed by the following principles:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Beatty***, 227 A.3d 1277, 1286 (Pa.Super. 2020) (cleaned up).

We have explained our standard of review for the denial of a suppression motion thusly:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are

bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*.

***Commonwealth v. Graham***, 353 A.3d 225, 229–30 (Pa.Super. 2026) (cleaned up).

Appellant's remaining issues, raising Rule 600, evidentiary, and sentencing challenges, are all subject to review for an abuse of discretion. ***See Commonwealth v. Cruz***, 348 A.3d 1199, 1207 (Pa.Super. 2025) (Rule 600); ***Commonwealth v. Dodd***, 339 A.3d 514, 517 (Pa.Super. 2025) (admission of evidence); ***Commonwealth v. Strouse***, 308 A.3d 879, 883 (Pa.Super. 2024) (discretionary aspects of sentencing). In this vein:

> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

***Cruz***, 348 A.3d at 1207 (cleaned up).

After a thorough review of the certified record, the parties' briefs, and the applicable law, we discern no error of law or abuse of discretion on the part of the trial court as to the issues raised by Appellant, and we affirm the judgment of sentence on the basis of the well-reasoned opinion that the Honorable Charles T. Jones, Jr., entered on August 22, 2025.

Specifically, Judge Jones properly rejected Appellant's argument that the evidence was insufficient to establish that he shot Jeter with the specific

- 5 -

intent to kill, as such can be inferred from his use of a deadly weapon on a vital part of the body. **See** Trial Court Opinion, 8/22/25, at 18-20. The court's explanation of the denial of Appellant's weight claim reflects a thoughtful review of the evidence and no abuse of discretion in concluding that the verdict did not shock the court's conscience.[3] **Id**. at 20-22. Concerning Appellant's suppression motion, Judge Jones aptly observed that the warrantless search of Appellant's bedroom was constitutionally sound because the police conducted the search pursuant to the consent of the lessee of the residence where Appellant had been staying, who had at least apparent, if not actual, authority to allow the search. **Id**. at 22-26, Exhibit A at 11-12.

The court concedes that Rule 600 required it to hold a hearing concerning the delay in bringing Appellant to trial, but Judge Jones properly classifies that error as harmless error. Appellant argues that there was an "issue of whether or not the time associated with the Commonwealth's interlocutory appeal was attributable to [Appellant] for Rule 600 purposes, or excusable if attributable to the Commonwealth." Appellant's brief at 32. However, Judge Jones adequately explains that the factual basis for the delays

---

[3] Appellant's weight challenge boils down to the assertion that Andino's testimony "was filled with problems" such that "it is questionable which evidence is to be believed." Appellant's brief at 26-27. However, "the jury resolved the inconsistencies among the testimonies as it saw fit and reached a verdict[,]" and it was for the trial judge, "having observed the proceedings," to assess the weight of the evidence, not this Court. **See Commonwealth v. Horne**, 89 A.3d 277, 286 (Pa.Super. 2014).

in the case was ascertainable from the docket, and the time attributable to the Commonwealth's successful interlocutory appeal was excludable from the Rule 600 computation. **See** Trial Court Opinion, 8/22/25, at 26-33. **See also Commonwealth v. Risoldi**, 238 A.3d 434, 453 (Pa.Super. 2020) (explaining that the delay caused by a good faith interlocutory appeal by the Commonwealth is excluded even if the appeal is unsuccessful).

As for Appellant's contentions that evidence of his gang involvement and the video of him wearing the recovered jacket while handling a large amount of cash were improper other-bad-acts evidence, the court identified valid bases for the evidence to be admitted and explained how their probative value outweighed the potential for prejudice. **See** Trial Court Opinion, 8/22/25, at 33-38.

Finally, we ascertain no abuse of discretion in the court's sentencing decision.[4] The court supported the propriety of Appellant's sentence by discussing how it reviewed and considered the relevant information, including the presentence investigation report, Appellant's mitigating evidence, and Appellant's "choice to continue his destructive lifestyle despite his family trying

_____

[4] Appellant challenged his sentence in his timely post-trial motion and includes in his brief a statement pursuant to Pa.R.A.P. 2119(f) asserting that the trial court failed to consider mitigating evidence in imposing an excessive sentence. **See** Appellant's brief at 36. Thus, his sentencing challenge is preserved for our review. **See**, **e.g.**, **Commonwealth v. Lekka**, 210 A.3d 343, 352 (Pa.Super. 2019) (holding substantial question was presented by claim that the court failed to consider mitigating evidence in imposing sentence of forty-five years to life for juvenile convicted of murder).

to help him," and imposed a lawful sentence. *Id.* at 38-41. Appellant's arguments suggest not an abuse of discretion by the trial court, but a desire for us to reweigh the mitigating factors more heavily in his favor. This we cannot do. *See Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa.Super. 2009) ("We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court.").

Therefore, we affirm Appellant's judgment of sentence on the basis of the court's August 22, 2025 opinion, which the parties shall attach hereto in the event of further proceedings.

Judgment of sentence affirmed.


Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 06/18/2026

# IN THE COURT OF COMMON PLEAS
# OF LEBANON COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

     v.

LINDLEY THELISMOND,
Appellant.

: 
: 
:   **Appellate:  869 MDA 2025**
:   **Trial:  CP-38-CR-539-2019**
: 
: 
:

## APPEARANCES

Pier N. Hess, Esquire                        For Commonwealth

Brandy Hoke, Esquire                      For Appellant

## OPINION BY JONES, JR., J.

Before this Court is Lindley Thelismond's (hereinafter "Appellant") appeal regarding the Court Order entered on June 27, 2023, denying his Post-Sentence Motion.

## PROCEDURAL HISTORY

On February 28, 2019, the Commonwealth charged Appellant, Lindley Thelismond, with one (1) count of Criminal Homicide (F1) under 18 § 2501(a). On June 23, 2022, after a three (3) day trial, a jury found Appellant Guilty of Count 1, Criminal Homicide, murder of the first degree.

On February 21, 2023, this Court sentenced Appellant on Count 1 – Criminal Homicide, a felony of the first degree, to pay the costs of prosecution, pay fines totaling one hundred dollars ($100), and be incarcerated in a State Correctional Institute for an indeterminate period, the minimum of which was fifty (50) years and the maximum of which was life. The Court found that Appellant was not RRR-I

eligible and not boot camp eligible. Appellant was entitled to time credit for the period from February 28, 2019, until February 21, 2023.

On February 26, 2025, Appellant filed a timely appeal with the Superior Court of Pennsylvania. On February 27, 2023, Appellant filed Post-Sentence Motions. Appellant filed a Brief in Support of his Post-Sentence Motions on April 21, 2023. On April 28, 2023, the Commonwealth filed a Brief in Opposition to the Post-Sentence Motions. On June 27, 2023, the Trial Court entered an Order and Opinion denying Appellant's Post-Sentence Motions.

On July 21, 2023, Appellant filed a timely Notice of Appeal and a Concise Statement of Matters Complained of on Appeal on August 21, 2023. On September 13, 2023, the Trial Court filed an Order and Opinion directing the file be sent to the Superior Court of Pennsylvania. On February 12, 2024, the Superior Court issued an Order dismissing the Appeal due to counsel having failed to file a brief for Appellant.

On January 10, 2025, Appellant filed a Post Conviction Relief Act ("PCRA") Petition based on ineffective assistance of counsel. On May 27, 2025, following a hearing on Appellant's PCRA Petition, this Court entered an Order reinstating Appellant's appellate rights. On June 26, 2025, Appellate filed a Notice of Appeal to the Superior Court. Appellant filed a timely Pa.R.A.P. 1925(b) statement on June 26, 2025. This matter is ripe for disposition.

**FACTUAL HISTORY**

After a trial held on June 20, 2022, through June 23, 2022, the jury found Appellant guilty of criminal homicide, murder of the first degree, pursuant to 18 Pa.C.S.A. § 2501(a). The testimony and evidence presented at trial supporting that conviction included the following.

On February 27, 2019, at approximately 10:20 P.M., Officers from the Lebanon City Police Department responded to a report of an individual being shot

3

at 1036 Orchard Avenue, Lebanon, PA. (Notes of Testimony, Trial, (hereinafter "N.T.") June 21, 2022, at 33.) Upon arrival, Officers located the victim, identified as twenty-six-year-old James Jeter (hereinafter "Jeter"), lying on the floor. (N.T. 36-37, 42, 70, 232.) Jeter was found with his cell phone between his hands, and his pockets contained only lip balm, a small amount of cash, and an identification card with his name. (N.T. 38, 43.) Sergeant Steven Bord testified that upon arriving Jeter was breathing, and his eyes would track a little bit, but he was unable to speak. (N.T. 36-38.) While waiting for the medics to arrive, Jeter's breathing became slower and further apart. (N.T. 37.) Medics arrived and attempted treatment, but their efforts were ultimately unsuccessful. (N.T. 38, 51-53.) Jeter was declared deceased at the scene. (N.T. 44, 56.)

Sergeant Bord further testified that he observed evidence of gunshot wounds including blood on Jeter's hand and chest area. (Exhibit 2; N.T. 38-39.) Sergeant Bord also saw two 9mm semiautomatic cartridge cases bearing a Federal headstamp near Jeter's body, one at Jeter's feet and one east of his head. (Id.) A bullet was also later discovered underneath Jeter's body. (Exhibit 3C; N.T. 59.)

Dr. Peter Williams testified as the expert forensic pathologist who conducted the autopsy on Jeter on March 1, 2019. (N.T. 61-62, 64-65, 67-68.) As part of the autopsy process, Dr. Williams removed Jeter's clothing and located a bullet within that clothing. (Exhibit 6; N.T. 80-81.) Dr. Williams determined that Jeter had five wounds consisting of: (1) a wound to the chest, for which the bullet went through the right lung, the heart, the liver, the pancreas, and the left kidney before exiting out of the body; (2) a wound to the right lateral arm near the shoulder which exited the body out through the arm pit area; (3) a wound and fracture to right arm, near the mid-forearm, with an exit wound by the wrist; (4) a wound and fracture to the left dorsal hand with an exit from the palm; and (5) a wound to the left arm with a corresponding exit wound. (N.T. 74-79.) Dr. Williams testified that the first gunshot

4

wound which penetrated Jeter's heart, kidney, and lung, was the most fatal and would have been fatal by itself, killing Jeter within seconds or minutes. (N.T. 75.) Dr. Williams concluded that the sole cause of death to Jeter was multiple gunshot wounds, and the manner of death was homicide. (N.T. 81, 90.)

Richard Andino (hereinafter "Andino") testified that he saw Appellant shoot his good friend, Jeter, on the night of February 27, 2019. (N.T. 102-103.) He testified that on that night, Appellant and Jeter came to Andino's house located at 1036 Orchard Avenue, in Lebanon. (N.T. 110-114.) Andino's kids were upstairs, and his wife was at work for the evening. (N.T. 111.) Andino testified that Appellant arrived first, wearing a red jacket and carrying a bookbag. (N.T. 123-124, 174-177.) Later on in the night, Jeter texted Andino that he was coming over. (N.T. 112-113.) Andino further testified that Appellant and Jeter had never met prior to that evening. (N.T. 106.)

At the time of the shooting, all three men, Andino, Appellant, and Jeter, were members of the Crips gang which had multiple subdivisions. At the time of the shooting, Andino and Defendant were both members of the Insane subdivision of the Crips. (N.T. 104, 106-107.) Jeter's subdivision in the gang was not established at trial. Andino testified that Appellant "had gotten himself into a little situation down in New York in Brooklyn" with the A-Train subdivision of the gang. (N.T. 107.) That is when a higher-ranking gang member requested that Andino find Appellant a place to stay in Lebanon under Andino's watch and authority for a while. (N.T. 105, 107-109, 243.) Andino helped Appellant, who was seventeen years old at the time, secure a place to live on Twelfth Street and helped him procure a cell phone which served as the means for Andino and Appellant to communicate. (N.T. 109-111, 223, 232.)

That night, while at Andino's house, Jeter started a conversation with Appellant asking him where he was from. (N.T. 115.) Appellant told Jeter he was from Brooklyn, Flatbush, and Jeter responded that he was also from Flatbush – the Vanderveer side. (N.T. 115, 118.) Andino explained to the Court that Vanderveer is the name for projects inside of Flatbush and was the area where the A-Train subdivision of the Crips lived. (N.T. 118.) Andino stated that it was when Jeter said Vanderveer that Appellant began to increase his volume. (Id.) At one point, Appellant started getting defensive, escalating the conversation into an argument and kept asking Jeter "Why you got your hands in your pocket? Why are you asking me these questions? Do you wanna fight?" (N.T. 115-116.) Andino testified that at this time Appellant was the one yelling, not Jeter. (N.T. 244.) Andino tried to intervene, telling Appellant to calm down and that they were not going to fight in his house. (N.T. 116, 122, 244.)

When the argument continued, Andino called the higher up member in the gang saying Appellant needed to leave and go back to New York because he was "acting crazy" and "wilding out". (N.T. 116-117, 120, 243.) Appellant then got on the phone with the higher up and told him he wanted to fight. (N.T. at 121.) Andino testified that he wanted Appellant out of his house and called a cab to come pick Appellant up and take him home. (N.T. 117, 121, 244.) However, Andino felt the cab was taking too long, so he called a friend, Ronny Torres ("Torres") also known as "Ezra", who was also a member of the Crips gang, to come pick up Appellant. (N.T. 117, 129.) Just as Andino hung up the phone with Torres, he heard the cab beep its horn outside and told Appellant the cab was there for him. (N.T. 122.)

Appellant began to put on his coat, the red jacket, and went to retrieve his backpack. (N.T. 123-124.) Andino testified that when he believed Appellant was leaving, he turned towards Jeter and began to apologize for the situation. (N.T. 124.) That is when Jeter said, "he's shooting me". (Id.) Andino turned to look at Appellant

and saw Appellant was holding a black, semiautomatic handgun in his right hand, which was pointed towards Andino's face. (N.T. 124-125.) Andino stated that the gun appeared to be locked or out of bullets. (N.T. 125.) At that point, Appellant was within one or two feet of Andino and within four or five feet of Jeter. (N.T. 126.) Appellant grabbed his backpack and ran out the back door of the house which leads to an alley. (N.T. 126.)

At this time, Andino called 911. (N.T. 127.) During the 911 call, Andino falsely indicated in that call that he was elsewhere because he had outstanding warrants. However, he accurately told the 911 operator that someone had been shot at 1036 Orchard Avenue and identified the shooter as "Fader", the name Andino used to refer to Appellant. (N.T. 174, 190-191.) While he was calling 911, Andino got his children, ages 17 and 11, and left the house. (N.T. 127-128.) Andino and his children left using the back door so that they would not see Jeter lying in the living room. (N.T. 128.) They then walked out the alley down 11th Street and towards Lehman Street where they were picked up by Torres and a male teenager in the passenger seat. (N.T. 128-129, 193-194, 249.)

Andino testified that they first drove down 11th Street and then turned down the alley behind Andino's home – the same alley Appellant had used to flee. (N.T. 130.) When Torres turned into the alley, Andino saw guns laying on the sidewalk underneath a gas meter. (N.T. 131, 197.) Andino testified that he then decided to get out of the car and pick the guns up stating that he did not want those guns to be found outside of his wife's house. (N.T. 131-132.) Andino picked up three guns with his bare hands, including the "broken" gun Appellant had pointed at him. (N.T. 132.) He then handed the guns to the juvenile in the front passenger seat, who placed them in a bookbag beneath his feet. (N.T. 132-133, 198-199.) Andino got back in the car and the group continued driving down the alley where they saw Appellant's red jacket on the ground. (N.T. 133-134, 201.)

7

At this time the police pulled them over. (N.T. 134.) Everyone in the car was taken to the police department for questioning and Andino was arrested. (Id.) Once at the police station, Andino helped the police identify Appellant through his Facebook account. (N.T. 141-143.) Andino further allowed police to take his phone into evidence and look through it. (N.T. 143-144.) Andino told police he thought he knew where the Appellant lived and ultimately made two recorded phone calls to help police locate Appellant. (N.T. 144, 161-162, 164.) The recorded phone calls were played for the jury. (Exhibit 23A, 23B, 23C (transcript of the calls). A download of Andino's phone also showed a video dated January 27, 2019, in which Appellant was wearing the red jacket that was found that night in the alley. (Exhibit 17; N.T. 163, 202, 461.) Andino also testified he never saw anyone except Appellant wear that jacket. (N.T. 202.)

Torres also testified regarding the night of the shooting. He told police on that night he had gotten a call to pick up Andino and his children. (N.T. 251, 259, 266.) Torres stated that when he picked Andino up that night he was "like hyperventilating. He was like he was stuttering, not speaking clearly, scared." (N.T. 257.) Torres also testified that Andino "was just frantic when I picked him up. He said somebody is tripped out and things went bad." (N.T. 268.) Torres was initially uncooperative with police; however, after police identified who the victim was Torres became more forthcoming. (N.T. 265-266.) Torres then told the police he had picked up Andino and his children that night and while driving the juvenile passenger or Andino had gotten out and picked up the guns from the alley. (N.T. 266.)

Sergeant Keith Uhrich of the Lebanon City Police interviewed both Andino and Torres within hours of the homicide. (Exhibits 24, 24A, 29, 29A, 92; 92A; N.T. 272.) Sergeant Uhrich testified that both Andino and Torres consented to a gunshot residue kit. (N.T. 266-277.) Sergeant Uhrich explained that an individual could test

8

positive for gunshot residue for multiple reasons including, if they had shot a gun recently, if they had handled a gun that was recently fired, or if they had been in a room where a gun had been fired recently. (N.T. 277.) Andino indicated in his interview that he was in close proximity to Appellant when Jeter was shot. (N.T. 279.)

Andino's representations to Sergeant Uhrich during that interview hours after the homicide were consistent with the narrative he provided in his trial testimony. (N.T. 280-86, 300-302) The information Torres provided to Sergeant Uhrich in the interview was also consistent with the testimony he provided at trial. (N.T. 285-286, 295-298.) Sergeant Uhrich also testified to Andino's role in assisting police identify Appellant as the shooter and locating Appellant. (N.T. 287-290.)

To corroborate Andino's statements and timeline of the night, Sergeant Uhrich compared Andino's statement to the call log of Andino's phone. (N.T. 289-295.) The call log indicated a call to "Cab Lebanon" at 10:06 P.M., followed by three calls with "BC iiinsane", the higher up gang member, with the last one beginning at 10:12 P.M. (Exhibit 92A; N.T. 294.) The call log showed outgoing calls to "iiinsane Ezra", Torres, at 10:17 P.M. and again at 10:21 P.M. The call log also showed a call to 911 at 10:18 P.M. (Exhibit 92A; N.T. 213, 294-295, 313.)

During the second day of trial Chief Jonathan Hess testified. At the time of the investigation in this case, Chief Hess was a Lieutenant in charge of the Detective Division. (N.T. 354, 359.) Chief Hess testified regarding Andino's assistance in the investigation, including providing a Facebook account for the shooter. (N.T. 356.) The Facebook account had the profile name "Lindley Escobar", but Andino did not know the individual's legal name. (Exhibit 33, 33A; N.T. 356.) From the information provided on the Facebook account, Chief Hess was able to identify the individual by his government name which was Lindley Thelismond. (N.T. 358.)

Chief Hess also testified to Andino's assistance in helping the police locate Appellant. Chief Hess explained that a decision was made to have Andino make recorded phone calls to ascertain the whereabouts of Appellant. (N.T. 359.) In the second phone call when Andino is speaking to Appellant, Appellant makes some incriminating statements. (Exhibit 23C (transcript of the call); N.T. 366-369.) Those statements included the following.

> ANDINO: ". . . What you doing? Sleeping, cuz?"
> THELISMOND: "Yeah."
> ANDINO: "How you sleeping after that shit . . ."
>
> . . .
>
> ANDINO: ". . . can you just answer me that one question, cuz, why? Why you do it, cuz? . . ."
>
> . . .
>
> ANDINO: "Talk to me, cuz. Apologize to me, something, cuz. Apologize to my family, cuz. Something, cuz. Talk to me."
> THELISMOND: "I apologize."
>
> . . .
>
> THELISMOND: "I'm sorry for your family cuz. I'm sorry."
>
> . . .
>
> THELISMOND: "I feel like my life was in danger, cuz."
> ANDINO: "You felt like you life was in danger so you shot him, cuz? Come on, cuz. He didn't have no gun or nothing, my nigga."
>
> . . .
>
> THELISMOND: "I didn't mean for this to happen, but I felt my life was in danger, cuz."

(Exhibit 23C.) Through the recorded phone calls, police were able to confirm that Appellant was at the address Andino had set up for Appellant located at 381 North Twelfth Street in Lebanon, PA. (N.T. 369.)

At that point, Chief Hess began to organize with other officers to establish a surveillance of 381 North 12th Street. (N.T. 370-371.) With the residence surrounded, Chief Hess began ordering the residents and Appellant, by name, to exit.

(N.T. 374-377.) A female resident, Jessica Bleecker, and Matthew Correia, the person Andino called to locate Appellant, exited the residence. (N.T. 377-378.) Matthew Correia confirmed that Appellant was still inside the residence as well as a nine-year-old boy. (N.T 379.) After approximately ten minutes of Appellant failing to exit the residence, Chief Hess and other officers entered the residence. (N.T. 379-380.) Chief Hess testified that all officers were clearly identifiable as law enforcement and once inside they were again identifying themselves and calling for Appellant to come out. (N.T. 380.) Eventually, Appellant appeared and came down the stairs. (N.T. 381-382.) Appellant was taken into custody and transported to the police station. (N.T. 383.) Chief Hess testified that at the time Appellant was taken into custody, he did not observe any injury to Appellant, nor did he seek any medical attention. (N.T. 391-392.)

Once Appellant was out of the residence, Chief Hess received permission from Jessica Bleecker, the lessee of the home, to search the home for evidence of the shooting. (N.T. 384.) Bleecker identified a room on the second floor as belonging to Appellant. (Id.) From the room, Chief Hess removed a Nike backpack and a clear plastic bag that contained what appeared to be clothing and socks. (Exhibits 37A, 37B; N.T. 385-387.)[1] Chief Hess also stated that a winter coat was not found in Appellant's room and that Appellant was not wearing one at the time of his arrest. (N.T. 388-389.)

The Court also heard testimony from Detective David Shaffer who stated that he helped process the crime scene at 1036 Orchard Avenue in the hours after the homicide. (N.T. 405.) Detective Shaffer testified that once a search warrant was obtained for the residence, he then began taking photographs and identifying pieces

---

[1] The parties reached a stipulation that had Matthew Correia testified, he would have indicated that the Nike backpack and clear trash bag seized from inside the residence, as well as their contents, did not belong to him. (N.T. 397.)

of evidence for collection. (Exhibits 44A-44AA; N.T. 406.) Detective Shaffer also stated that Jeter was already deceased when he arrived at the scene. (N.T. 406.) He further testified that he observed gunshot wounds to Jeter's body and shell casings near him. (Exhibits 44C-44K; N.T. 406-415.) Detective Shaffer stated he observed 9mm Federal headstamped shell casings in the room and a bullet underneath Appellant's body. (Exhibits 46, 47A, 47B; N.T. 406-407, 413.)

In addition to those items, Detective Shaffer collected two cellphones (those belonging to Jeter and Appellant) from the scene as well as the red jacket from the alley. (Exhibits 48, 49, 50; N.T. 417, 421, 424.) On recall, Chief Hess testified regarding forensic downloads of the cellphones retrieved from the crime scene. (N.T. 445.) The forensic download of both Andino's phone and Appellant's linked Appellant to the red jacket and the 381 North 12th Street address. (Exhibit 17, N.T. 457, 459-462.)

Detective Randall Fields testified he received evidence that was collected by Chief Hess at the 12th Street residence. (N.T. 432.) That evidence was the backpack and the plastic trash bag. (Id.) After police obtained a search warrant for those items, Detective Fields searched the two bags and photographed the contents. (Id.) In addition to clothing, Detective Fields found one 40 caliber bullet in the clear bag and four rounds of Ruger 9MM ammunition in the backpack. (Exhibits 52A, 52B; N.T. 433-437.)

The Court also heard testimony from Jessica Mulhollem, a forensic scientist working for the Pennsylvania State Police. Ms. Mulhollem testified that she tested gunshot residue kits collected from Andino, Torres, I.L., and Appellant. (N.T. 477.) All four men had particles that were either characteristic of or indicative of gunshot residue. (N.T. 477.) Similar to the testimony of Sergeant Uhrich, Ms. Mulhollem opined that an individual could have characteristic particles for gunshot residue for multiple reasons such as picking up a gun that was recently fired, standing in close

12

proximity to a firearm when it was discharged, and coming into contact with gunshot residue on another item. (N.T. 479-480.) Ms. Mullhollem concluded in her report that because Andino had characteristic particles, he may have recently handled or discharged a firearm, was in close proximity to a firearm when it was discharged, or came into contact with gunshot residue on another item. (N.T. 488.) Her testing could not differentiate between gunshot residue resulting from a subject firing a firearm from gunshot residue resulting from a secondary transfer. (N.T. 489.)

Ms. Mulhollem also explained that a negative test did not necessarily mean the subject did not fire a gun. (N.T. 473.) Various variables affected such test results including washing the gunshot residue away or the passage of time. (N.T. 472-473.) Appellant's test results did not confirm characteristic particles of gunshot residue but did confirm indicative particles of gunshot residue on his hands after he was taken into custody. (N.T. 480-481.) Ms. Mulhollem also tested samples collected from the red jacket found in the alley, specifically the right cuff, the right arm and chest, the left cuff, and the left arm and chest of the jacket. (N.T. 481-482.) The test confirmed both characteristic and indicative particles on all of those areas on the jacket. (N.T. 482.)

Authur Young, a Forensic Biology Specialist, testified as an expert in DNA analysis. Mr. Young stated that he was asked to test the red jacket found in this case. (Exhibit 50; N.T. 519.) Mr. Young testified that the results of the jacket revealed a DNA mixture as opposed to a single profile, (N.T. 523.) However, he testified that he was able to find a major and minor contributor of the DNA on the jacket. Mr. Young concluded that the major DNA profile from the jacket was consistent with that of Appellant. (N.T. 524.) Mr. Young also compared the minor DNA profile to that of the victim, Jeter, but that it was not a match. (N.T. 525.) Mr. Young explained that the minor DNA profile could have gotten on the jacket in multiple ways, such

as the wearer touching a surface and then transferring DNA onto the jacket. (N.T. 526.)

The next witness, Officer Sean Buck, testified while he was at 1036 Orchard Avenue on the night of the shooting, he heard a car door shut and then noticed headlights travelling from the rear of the residence down the alley. (N.T. 547.) While Officer Buck was running back to his patrol vehicle, he observed the vehicle traveling down the alley behind the residence. (N.T. 547-548.) Officer Buck testified that it was an older green Ford SUV. (N.T. 548.) It was at this time that he got into his patrol vehicle and gave chase. (Id.) When Officer Buck located the vehicle he conducted a traffic stop. (N.T. 559.)

Upon approaching the vehicle, Officer Buck identified the driver of the vehicle as Torres and the passenger was 17-year-old I.L. (Id.) In the back of the vehicle was one adult and two juveniles, later identified as Andino and his two children. (N.T. 550-551.) As part of the stop, Officer Buck asked Torres if there were any weapons in the car. (N.T. 552.) Torres indicated there was a registered handgun in the glove box and he had a concealed carry permit. (Id.) At this time, Officer Buck had Torres and I.L. step out of the vehicle and performed a pat down search of them to check for any additional weapons. (N.T. 553.)

Officer Buck also observed a backpack located at I.L.'s feet. Officer Buck testified that when he picked up the backpack, he heard a "bunch of metal clanging around" and explained that because the backpack was a soft-shell type, he could feel around it to get an idea of the contents. (N.T. 553-554.) That is when it became immediately apparent that there was at least one handgun inside the backpack. (Id.) Officer Buck then searched the backpack and found three handguns: a Davis semiautomatic handgun, a Highpoint 9mm semiautomatic handgun, and a Taurus TKS34542 9mm semiautomatic handgun. (Exhibits 69F-69I; N.T. 555-558.) Both the Highpoint and the Taurus 9mm semiautomatic handguns still had live rounds in

14

their magazines. (N.T. 558-560.) Officer Buck also testified that the Taurus TKS34542 9mm had some type of jam in the weapon with the slide locked back. (Exhibits 65, 69H-I; N.T. 558-560.)

On recall, Chief Hess testified that the 9mm rounds discovered in Appellant's backpack at the 12th Street address were identical in caliber and manufacturer to the ammunition recovered by Officer Buck from the Highpoint 9mm semiautomatic handgun. (N.T. 594.) Chief Hess also explained that the 9mm cartridge cases found at the crime scene next to the victim's body, the cartridge case found jammed into the Taurus 9mm semiautomatic handgun, and the remaining ammunition cleared from the Taurus 9mm semiautomatic handgun by Officer Buck during the traffic stop, were all headstamped, Federal 9mm NFCR. (N.T. 596-597.)

Chief Hess also testified on recall as it related to swabbing the firearm for DNA testing, specifically the Taurus TKS34542 9mm. (N.T. 602-603.) He stated that he was able to develop what he thought were two potentially identifiable prints off the magazine of the Taurus 9mm semiautomatic handgun. (Exhibits 72A, 72C; N.T. 603.) Upon arrest, Appellants fingerprints and palm prints were taken. (Exhibit 73; N.T. 607-608.) Chief Hess then sent both prints retrieved from the magazine, as well as Appellants prints taken upon arrest to the lab for fingerprint analysis. (N.T. 606-607, 609.)

The Court heard testimony from Angela Schultheis, a forensic DNA scientist in the State Police DNA laboratory, who was qualified as an expert in DNA analysis and testing. Ms. Schultheis received swabs taken from the firearms themselves and from the discharged cartridge cases collected in the instant case. (N.T. 626.) She was also given two known DNA samples, one belonging to the victim, Jeter, and the second belonging to Appellant. (Id.) As it relates to the swab taken from the magazine and ammunition of the Taurus 9mm semiautomatic handgun, Ms. Schultheis obtained a partial DNA profile consistent with a mixture of at least two

15

individuals. (N.T. 627, 637.) However, Ms. Schultheis testified that the major component of the profile was a match to the known reference from Appellant. (Id.) She further calculated that the probability of selecting someone with that combination of DNA types is approximately 1 in 27 sextillion from the Caucasian population, 1 in 300 quintillion from the African American population, and 1 in 410 quintillion from the Hispanic population. (N.T. 627-628.)

Corporal David Turbow, an expert Firearm and Tool Mark Examiner with the Pennsylvania State Police, examined the firearms and firearms-related evidence involved in the instant case. (N.T. 644-645.) That examination specifically included the four firearms collected on the evening of the homicide, including the Taurus with serial number TKS collected from the bookbag at I.L.'s feet. Corporal Turbow also examined the three discharged cartridge cases and two plated bullets; one recovered from under Jeter's body at the crime scene and one recovered from Jeter's clothing during the autopsy. (N.T. 647-648, 652.) The purpose of his examination was to determine whether any of the evidence collected from the crime scene had been fired by any of the four submitted firearms. (N.T. 648.) Based on his examination, Corporal Turbow concluded that the cartridge cases collected at the crime scene had all been discharged by the Taurus TKS34542 9mm semiautomatic handgun. (N.T. 657.)

On recall, Sergeant Bord testified as an expert in fingerprint analysis and identification. Sergeant Bord compared the latent prints lifted by Chief Hess from the magazine of the Taurus TKS34542 9mm to the palmprint taken of Appellant upon arrest. (N.T. 668.) Sergeant Bord testified that there was an exorbitant number of correlating marks between the two sets of prints. (N.T. 672-673.) Based on that, he concluded that the latent palmprint taken from the magazine of the weapon used in the shooting was conclusively that of Appellant. (Exhibit 83B; N.T. 674.)

16

Sergeant James Petti of the Pennsylvania State Police also testified as an expert witness in fingerprint analysis and identification. (N.T. 684.) While Sergeant Petti did not conduct the original fingerprint analysis in the case, he was asked to verify the findings of Sergeant Bord. (Id.) Consistent with that of Sergeant Bord, Sergeant Petti concluded that the unknown print lifted from the magazine of the Taurus TKS34542 9mm matched the known palmprint of Appellant. (Exhibit 86; N.T. 685-687.)

## DISCUSSION

Appellant appeals from the Court Order entered on June 27, 2023, in which Appellant's Post-Sentence Motion was denied. Appellant's Concise Statement raises seven (7) issues on appeal. The first two issues Appellant complains of on appeal relate to the trial court's denial of Appellant's motions for a new trial. Appellant first argues that the trial court erred in denying Defendant's motion for a new trial on the basis that the Commonwealth failed to present sufficient evidence as it relates to the element of specific intent to kill. The second issue Appellant complains of relates the trial court denying Defendant's motion for a new trial based on the verdict being against the weight of the evidence as it relates to DNA evidence.

The third, fourth, and fifth issues Appellant complains of on appeal relate to pre-trial motions. Pursuant to Appellant's third issue, Appellant argues the trial court erred by denying Defendant's pre-trial motion to suppress evidence recovered without a warrant. The fourth issue Appellant raises on appeal relates to the trial court denying Appellant's motion to dismiss under Pa.R.Crim.P. 600 without first holding a hearing. The fifth issue Appellant raises on appeal is that the trial court erred by denying Appellant's motion *in limine* and admitted evidence related to Appellant's gang affiliation.

Appellant also argues an error regarding the admission of evidence during trial and the appropriateness of the eventual sentence imposed. In Appellant's concise

statement of matters complained of on appeal, the sixth issue Appellant asserts is that the trial court erred by allowing the admission and publication of a video depicting Appellant holding large sums of money. Lastly, the seventh issue Appellant complains of on appeal is that the trial court erred in crafting an appropriate sentence in this case.

## I. Whether the trial court erred in denying Defendant's motion for a new trial on the basis that the Commonwealth failed to present sufficient evidence that Defendant formed and held a specific intent to kill to support the Jury's verdict of guilty for first-degree homicide.

In his Concise Statement, Appellant assigns error to the Court's failure to grant him a new trial on the basis that the Commonwealth failed to present sufficient evidence that Defendant formed and held a specific intent to kill to support the Jury's verdict of guilty for first-degree homicide. A challenge to the sufficiency of the evidence is a question of law and is therefore subject to plenary review on appeal. *Commonwealth v. Teems*, 74 A.3d 142, 144 (Pa. Super. 2013). In evaluating a claim regarding the sufficiency of evidence, the appellate court must view the evidence at trial, and all reasonable inferences derived therefrom, in the light most favorable to the verdict winner (here, the Commonwealth) in determining whether a reasonable jury could have found that each element of the crime(s) charged was established beyond a reasonable doubt. *Commonwealth v. Patterson*, 940 A.2d 493, 500 (Pa. Super. 2007) *citing Commonwealth v. Emler*, 903 A.2d 1273, 1276–77 (Pa. Super. 2006).

The appellate court may not weigh the evidence or substitute its judgment for that of the fact-finder. *Id*. The evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt. *Id*. In determining the credibility of witnesses, the finder of fact is the exclusive judge of the weight of the evidence, and is free to believe all, part, or none of the evidence presented. *Teems*, 74 A.3d at 144.

18

The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence, and need neither preclude every possibility of innocence, nor establish guilt to a mathematical certainty. *Teems*, 74 A.3d at 144; *Commonwealth v. Davis*, 861 A.2d 310, 323 (Pa. Super. 2004). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Johnson*, 833 A.2d 260, 262-63 (Pa. Super. 2003).

To convict a defendant of first-degree murder, the jury must find that (1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill. *See* **18 Pa.C.S. § 2502(a)**; *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000). A specific intent to kill may be proven by circumstantial evidence, such as the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Bond*, 652 A.2d 308, 311 (Pa. 1995).

Appellant's argument is wholly without merit. As stated previously, specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the victim's body. (*Id.*) Following a verbal argument with the victim, James Jeter, Appellant was asked to leave by the residence owner, Andino. However, instead of peacefully leaving the residence, Appellant took out a Taurus 9mm semiautomatic handgun, which is clearly a deadly weapon. Upon brandishing the weapon, Appellant pointed the handgun at a vital part of Jeter's body and pulled the trigger. Appellant shot Jeter five times, three times at close range which hit Jeter in the chest and fatally damaged numerous vital organs as well as fired two other shots which hit the extremities. Taking all the circumstances surrounding the shooting into consideration, the jury had sufficient evidence from which they could reasonably

conclude Appellant possessed the specific intent to kill Jeter. Therefore, Appellant's claim is without merit and he is not entitled to relief on this issue.

**II.** **Whether the trial court erred by denying Appellant's motion for a new trial on the basis that the jury's verdict of guilty was against the weight of the evidence where the individual found by police in possession of the relevant firearm tested positive for gunshot residue and was not eliminated by DNA testing, and Appellant's hands did not test positive for gunshot residue and the same swab used to test for DNA on the firearm was used on multiple parts of the firearm.**

Appellant argues the trial court erred by denying Appellant a new trial on the basis that the verdict was against the weight of the evidence. A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Mucci*, 143 A.3d 399, 410 (Pa. Super. 2016). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000); *Commonwealth v. Mucci* at 410. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Widmer*, at 752; *Mucci*, at 410. For an Appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. *Mucci*, at 411. In other words, a verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Cruz*, 919 A.2d 279, 282 (Pa. Super. 2007).

20

Furthermore, the weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. *Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004); *Commonwealth v. Boxley*, 838 A.2d 608, 612 (Pa. 2003); *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995). Questions concerning inconsistent testimony and improper motive go to the credibility of the witnesses. *DeJesus*, at 107; *Boxley*, at 612. A court cannot substitute its judgment for that of the jury on issues of credibility. *DeJesus*, at 107; *Commonwealth v. Pronkoskie*, 445 A.2d 1203, 1206 (Pa. 1982).

In the instant case, four men tested positive for particles that were either characteristic of or indicative of gunshot residue. However, both Sergeant Uhrich and Jessica Mulhollem, a forensic scientist, testified that an individual could have characteristic particles for gunshot residue for multiple reasons such as picking up a gun that was recently fired, standing in close proximity to a firearm when it was discharged, and coming into contact with gunshot residue on another item. Ms. Mulhollem also explained that a negative test does not necessarily mean the subject did not fire a gun. Various variables affect such test results, including washing the gunshot residue away or the passage of time. While Appellant's test results did not confirm characteristic particles of gunshot residue, the results did confirm indicative particles of gunshot residue on his hands after he was taken into custody.

While Appellant may not have tested positive for gunshot residue, the distinctive red jacket, that was testified to having belonged to Appellant, tested positive for gunshot residue. Additional physical evidence was also presented at trial corroborating Appellant as the shooter, including the Appellant's palmprint on the magazine of the murder weapon, ballistic evidence found in the Appellant's personal belongings at Jessica Bleeker's home on 12th Street consistent with the firearms left

21

behind in his flight path, and Appellant's DNA found on the red jacket and murder weapon.

Furthermore, overwhelming additional evidence was presented at trial linking Appellant to the shooting. There was an eyewitness to the incident, and while Andino was not an ideal witness, he did not waiver in his identification of Appellant as the shooter. Andino also provided a reasonable explanation, including having outstanding warrants and gang protocol, for why he initially provided false information to the 911 operator, police officers, and investigators immediately after the shooting. However, he identified Appellant as the shooter immediately following the shooting in the 911 call he placed. Furthermore, Andino ultimately cooperated with law enforcement despite gang protocol and fear of retaliation. As Andino explained at trial, "[Appellant] killed my friend in my house where my kids [were] at and then went home and went to sleep as if nothing ever happened." (N.T., Trial, June 21, 2022, at 140). Moreover, Andino's identification of Appellant as the shooter and his trial testimony describing the circumstances surrounding the shooting were corroborated; including Appellant himself apologizing to Andino for the shooting on a recorded phone call.

Accordingly, this Court determined in this case that there were not any certain facts that were so clearly of greater weight which favored Appellant that to ignore them or to give them equal weight with all the facts would deny justice. Additionally, the result of this case did not shock this Court's conscience. Therefore, Appellant is not entitled to relief on this issue because this Court finds the verdict was not against the weight of the evidence.

### III. Whether the trial court erred by denying Defendant's pre-trial motion to suppress evidence recovered from his bedroom without a warrant.

Appellant also argues on appeal that the Court erred when it denied Appellant's Pre-Trial Motion to Suppress Evidence recovered from his bedroom

22

without a warrant. Both the Fourth Amendment of the United States and Article 1, §8 of the Pennsylvania Constitution protect against unreasonable searches and seizures. U.S. Const. Amend. IV; Pa. Const. Art 1, §8. A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, such that evidence obtained from the search in inadmissible, unless an established exception applies. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Commonwealth v. Strickler*, 757 A.2d 884, 888-89 (Pa. 2000). One such exception is consent. *Bustamonte*, at 219; *see also Strickler*, at 888-89. "A search warrant is not required . . . where a-person with the proper authority unequivocally and specifically consents to the search." *Commonwealth v. Reid*, 811 A.2d 530, 544 (Pa. 2002), *cert. denied*, 540 U.S. 850 (2003).

"[T]o have a reasonable expectation of privacy, one must intend to exclude others." *Commonwealth v. Lowery*, 451 A.2d 245, 247 (Pa. Super. 1982). Where joint access or control exists, there can be no reasonable or legitimate expectation of privacy. *Commonwealth v. Latshaw*, 392 A.2d 1301, 1305 (Pa. 1978); *Lowery*, 451 A.2d 245 at 248. Without a reasonable expectation of privacy, a defendant has no standing to challenge a search. *Commonwealth v. Karpinski*, 422 A.2d 190 (Pa. Super 1980); *see also Lowery*, at 247.

In the instant case, Appellant sought to exclude evidence removed from a second-floor bedroom at 381 North 12th Street. It was at this location that Appellant was apprehended on February 28, 2019, following the shooting. Appellant argued in a Pre-Trial Suppression Motion that the search was conducted without a warrant and because he "rented" the bedroom, the "homeowner" did not have authority to consent to a search of the bedroom. Following a suppression hearing, this Court entered an Order and Opinion dated August 18, 2020, denying the Appellant's Motion to Suppress based on principles of actual consent, apparent consent, and inevitable discovery. (Attached hereto as Exhibit A.)

23

The standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record. *Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa. Super. 2015). During the suppression hearing, Chief Hess testified that at the time of Appellant's apprehension at the North 12th Street residence Jessica Bleecker and Matthew Correa were also present at the residence. (Notes of Testimony, Suppression Hearing (hereinafter "N.T.S.H."), May 27, 2020, at 12-13, 23.) Chief Hess stated he spoke with Ms. Bleecker who indicated that her and her nine-year-old son were the only ones listed on the lease of the property. (N.T.S.H. 14.) It was then Ms. Bleecker who gave officers consent to search the residence and specially identified which room Appellant was staying in. (N.T.S.H. 15, 34-35.) Chief Hess testified that the door to Appellant's room was open and unlocked at the time they conducted the search. (N.T.S.H. 34-35.)

Ms. Bleecker identified only two items belonging to Appellant, a Nike backpack and a clear plastic bag. (Id.) The room contained no dresser or bed, just an air mattress on the floor. (N.T.S.H. 18, 29-30.) Chief Hess also testified that there was no mail, paperwork, or documentation found through a search of the entire residence tying Appellant to the property. (N.T.S.H 18.) The officers seized the Nike backpack and a clear plastic bag identified as belonging to Appellant from the second-floor bedroom. (Id.) A search warrant was later obtained for the items and officers recovered a total of five bullets, four of which matched the caliber found at the crime scene. (N.T.S.H 21.)

Based upon the evidence presented at the suppression hearing, the trial court concluded, as a threshold determination, that the Appellant had no expectation of privacy in the second-floor bedroom. The Court found that Ms. Bleecker had actual authority to consent to the search of the residence, including the second-floor bedroom as she was the only legal lessee of the property.

24

Furthermore, even if Ms. Bleeker did not have actual authority to consent to the search of the residence, she still had apparent authority to consent, making the officer's search still valid. If police act on the consent of a third party who does not have actual authority to render such consent, evidence seized during the search may still be admissible under the apparent authority exception. The apparent authority exception permits the admission of evidence when officers reasonably, though mistakenly, rely upon the consent of a third party who does not have actual authority to consent to a search. *Commonwealth v. Basking*, 970 A.2d 1181, 1200 (Pa. Super. 2009). A third party with apparent authority over the area to be searched may provide police with consent to search. Third party consent is valid when police reasonably believe a third party has authority to consent. *Commonwealth v. Strader*, 931 A.2d 630, 634 (Pa. 2007), *cert. denied*, 522 U.S. 1234 (2008).

As the testimony reflected, Chief Hess reasonably believed Ms. Bleecker had authority over the residence and could consent to a search of the home and relied on that consent. Prior to the search, Ms. Bleecker told Chief Hess that she resided at 381 North 12th Street and that she was the sole lessee along with her son. Ms. Bleecker also led Chief Hess to the second-floor bedroom which was unlocked and open and only identified two items in the room as belonging to Appellant. The room also did not appear to be set up for a permanent stay as it contained no bed or dresser. A search of the rest of the residence also resulted in the reasonable belief that Appellant was not a legitimate tenant as no mail or paperwork tied Appellant to the residence. Therefore, even if Ms. Bleecker did not have actual authority to consent to a search of the second-floor bedroom, the evidence found would still be admissible under the apparent authority exception.

In the Court's decision to deny the Appellant's Suppression Motion, it also found that the inevitable discovery exception would apply to prevent the suppression of the items retrieved from the second-floor bedroom on North 12th Street. The

inevitable discovery exception states that "if the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, then the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *Commonwealth v. Gonzalez*, 979 A.2d 879, 890 (Pa. Super. 2009). The Court found that the Commonwealth met this burden upon establishing that Chief Hess had adequate probable cause to obtain a search warrant for the 12th street residence, and but-for Chief Hess's reasonable reliance on Ms. Bleecker's consent to search, he would have obtained a search warrant and inevitably found the Nike backpack and clear plastic bag belonging to Appellant. For all the reasons stated above, the record supports the trial court's decision to deny the Appellant's Motion to Suppress Evidence and he is not entitled to relief on this issue.

### IV. Whether the trial court erred by denying Appellant's motion to dismiss under Pa.R.Crim.P. 600 without first providing Appellant a hearing as required under that rule.

Appellant's concise statements of matters complained of on appeal argues that the trial court erred in denying Appellant's motion to dismiss under Pa.R.Crim.P. 600 without first holding a hearing. Pursuant to Rule 600, trial in a court case in which a written complaint is filed against the Defendant shall commence within 365 days from the date on which the complaint is filed. **Pa.R.Crim.P. 600(A)(2)(a).** For purposes of Pa.R.Crim.P. 600(A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. **Pa.R.Crim.P. 600(C).** Any other periods of delay shall be excluded from the computation. *Id.* If a Defendant is not brought to trial within that time, he may file a written motion requesting that the charges be dismissed with prejudice on

26

the ground that this rule has been violated. **Pa.R.Crim.P. 600(D)**. The judge shall conduct a hearing on the motion. *Id.*

In general terms, Pa.R.Crim.P. 600 provides that the Commonwealth has 365 days from the date the complaint is filed to bring a case to trial or otherwise resolve the case by plea. **Pa.R.Crim.P. 600(A)(2)(a)**. For Rule 600 purposes, the date 365 days after the complaint is filed is known as the "mechanical run date." *Commonwealth v. Wiggins*, 248 A.3d 1285, 1288 (Pa. Super. 2021). Under Pa.R.Crim.P. 600(C), the mechanical run date is adjusted by excluding all time periods other than those periods of delay at any stage of proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence. *Id.* at 1289. That calculation results in the adjusted run date. *Id.* at 1288-89.

If a delay is created, in order to establish that the delay is excludable, the Commonwealth must demonstrate, by a preponderance of the evidence, that it exercised due diligence in opposing or responding to the pretrial motion. *Commonwealth v. Hill*, 736 A.2d 578, 587 (Pa. 1999). Moreover, an interlocutory appeal by the Commonwealth tolls Pa.R.Crim.P. 600 during the pendency of the appeal when the Commonwealth properly certifies that the order being appealed substantially handicaps its case. *Commonwealth v. Malinowski*, 671 A.2d 674, 678 (Pa. 1996); *Commonwealth v. Ferri*, 599 A.2d 208, 210 (Pa. Super. 1991). Likewise, the unavailability of a witness over which the Commonwealth has no control is excludable for Pa.R.Crim.P. 600 purposes. *Commonwealth v. Anderson*, 959 A.2d 1248, 1251-52 (Pa. Super. 2008). Finally, in a situation where the court is unavailable to hear a Defendant's case, the delay is excluded from Pa.R.Crim.P. 600 calculations. *Carl*, at 750-751. The court shall exclude any period of delay which is a result of any continuance granted at the Appellant's request. *Commonwealth v. Williams*, 726 A.2d 389, 392 (Pa. Super. 1999).

27

Rule 600 also states that a court considering a motion to dismiss on prompt trial grounds should hold a hearing on the issue. **Pa.R.Crim.P. 600(D)(1).** The purpose of the hearing is to afford both parties an opportunity to present factual allegations regarding if and why the Defendant was denied his right to a speedy trial. *Commonwealth v. McGeth*, 622 A.2d 940, 945 (Pa. Super. 1993).[2] However, if the docket entries demonstrate that the Defendant was brought to trial before the adjusted run date, then failing to hold a hearing is harmless error. *Id.*

In *Commonwealth v. McGeth*, the Superior Court of Pennsylvania upheld the trial court's denial of a prompt trial claim, despite the trial court's failure to hold a hearing on the issue. The Superior Court of Pennsylvania explained:

> While we agree in theory that the trial court erred in not conducting a [Pa.R.Crim.P. 600] hearing, we find no prejudice resulting to McGeth. Neither McGeth's written motion nor counsel's oral arguments included any factual allegations to be addressed at a hearing. Moreover, had the trial court conducted a hearing, it would have reviewed the docket entries which indicate that all the delays were excludable in favor of the Commonwealth. Trial commenced 732 days after McGeth's arrest; for 656 of those days the running of [Pa.R.Crim.P. 600] was tolled, so that the number of chargeable days was 76. Discharge under [Pa.R.Crim.P. 600] is available only if trial has not commenced after 365 chargeable days. The Commonwealth was well within the statutory time frame. Therefore, McGeth's petition was meritless on its face.

*McGeth*, at 945.

In the instant case, consistent with the language of *McGeth*, this Court's failure to hold a Pa.R.Crim.P. 600 hearing in the instant case was harmless error because the docket entries alone establish that Appellant, who sought defense

---

[2] Prior to the renumbering of the Rules of Criminal Procedure in 2001, Pa.R.Crim.P. 600 was numbered Pa.R.Crim.P. 1100. *Commonwealth v. Sloan*, 907 A.2d 460, 463 n.5 (Pa. 2006). Pennsylvania's appellate courts in interpreting Pa.R.Crim.P. 600 have considered and relied upon the precedential decisions under Pa.R.Crim.P. 1100. *Id.*

continuances and filed pretrial motions, was brought to trial before the adjusted run date. The criminal complaint against Appellant was filed on February 28, 2019. Appellant filed his Motion to Dismiss 1090 days later, on February 22, 2022. While Appellant's Motion to Dismiss clearly came after the mechanical run date of February 28, 2020, his motion was premature in light of the correct adjusted run date calculatable from the face of the docket entries, which the Court reviewed when Appellant filed his Rule 600 motion. Those calculations include the following time periods chargeable to Appellant and therefore added to the mechanical run date.

1.      March 7, 2019, to March 21, 2019, = 14 days excluded due to Appellant's continuance. Appellant's preliminary hearing was originally scheduled for March 7, 2019. Appellant continued the hearing until March 21, 2019, when the case was ultimately bound for court.

2.      March 25, 2019, to November 13, 2019, = 233 days excluded due to Appellant's motion to decertify. Appellant filed a motion to decertify on March 25, 2019. On March 26, 2019, at Appellant's request, the Court ordered a psychological evaluation of Appellant and directed defense counsel to list the matter for a hearing once the evaluation was completed. On November 13, 2019, this Court granted Appellant's motion to withdraw his motion to decertify, and no hearing on the motion was held.

3.      November 19, 2019, to August 18, 2020, = 273 days excluded due to Appellant's motion to suppress. Appellant filed a motion to suppress on November 8, 2019. By an order entered on November 19, 2019, the Court scheduled a hearing on the Appellant's suppression motion for January 8, 2020. On January 2, 2020, the Commonwealth filed a motion to continue that hearing, as the father of one of the Commonwealth's hearing witnesses passed away, and the witness was thus unavailable for the scheduled January 8, 2020, hearing. *See Anderson*, 959 A.2d 1248 at 1251-52. This Court did not hold this continuance of 28 days against the

Commonwealth because the request seemed reasonable and because of the caselaw above. The hearing was then rescheduled for February 5, 2020, when it was continued because it had been erroneously scheduled before the wrong judge. On March 4, 2020, Appellant filed a notice of diminished capacity defense. The parties held a status conference on March 10, 2020, at which time the pre-trial hearing was continued to March 25, 2020. Due to the state-wide judicial emergency, the pre-trial hearing was again continued until May 27, 2020. At the conclusion of the pre-trial hearing on May 27, 2020, the parties were directed to file briefs by July 10, 2020. The Commonwealth filed its brief on July 9, 2020. Appellant filed his brief on July 10, 2020. By an order and opinion entered August 18, 2020, this Court denied the Appellant's motion to suppress.

4.    August 18, 2020, to February 22, 2022, = 553 days excluded due to the motions *in limine* and the resulting interlocutory appeal. On August 5, 2020, Appellant filed a motion *in limine*, seeking to preclude admission of evidence of gang affiliation and drug dealing on the part of Appellant. On August 6, 2020, Appellant filed his amended motion *in limine*. Later that same date, the Commonwealth filed an opposing motion *in limine*, seeking to admit evidence of gang affiliation and drug dealing. While this Court originally set a date of October 12, 2020, for the hearing, the hearing was moved up to September 18, 2020, at the request of the Commonwealth. Appellant and the Commonwealth submitted memoranda of law in support of their positions on September 21, 2020, and September 22, 2020, respectively. On September 24, 2020, this Court entered an order that granted Appellant's motion *in limine* as to gang affiliation and drug dealing.

Four days later, on September 28, 2020, the Commonwealth filed a notice of appeal on both issues. That notice certified this Court's September 24, 2020, order substantially handicapped the Commonwealth's case pursuant to Pa.R.A.P. 311(d).

30

In compliance with this Court's order of September 29, 2020, the Commonwealth filed a timely concise statement on October 19, 2020. On November 25, 2020, this Court issued its Pa.R.A.P. 1925 order and opinion and directed that the file be transmitted to the Superior Court of Pennsylvania. On December 2, 2020, the Clerk of Courts transmitted the record of the case to the Superior Court of Pennsylvania. On December 3, 2020, the Superior Court of Pennsylvania set a briefing schedule for the case and ordered the Commonwealth to file its brief and reproduced record by January 12, 2021. On December 14, 2020, the Commonwealth requested a 30-day extension to file its brief and reproduced record. That extension, to February 11, 2021, was granted. This Court did not hold this continuance of 29 days against the Commonwealth because the request seemed reasonable and because the Commonwealth was pursuing its interlocutory appeal in accordance with the caselaw above. On January 25, 2021, the Commonwealth filed a motion with this Court to supplement the record, because certain exhibits from September 18, 2020, hearing had not been included by the Clerk of Courts in the certified record. On January 26, 2021, this Court granted that motion, and on January 27, 2021, the Clerk of Courts complied and sent the missing items to the Superior Court of Pennsylvania.

On February 10, 2021, the Commonwealth filed its brief and reproduced record which included the items identified in the motion to supplement the record, with the Superior Court of Pennsylvania. On February 17, 2021, after receiving the oral argument request letter from the Superior Court of Pennsylvania, the Commonwealth requested oral argument. On March 10, 2021, Appellant filed his brief before the Superior Court of Pennsylvania. Following oral argument on June 8, 2021, the Superior Court of Pennsylvania on February 14, 2022, filed its decision on the matter. The Superior Court of Pennsylvania concurred with the Commonwealth's claims of error, vacated this Court's decision entered September 24, 2020, and remanded the case back to this Court for further decision. At the time

31

Appellant filed his February 22, 2022, motion to dismiss, the Superior Court of Pennsylvania had still not transmitted the record back to this Court. The Superior Court of Pennsylvania did so on March 29, 2022, and on April 21, 2022, this Court issued an order and opinion permitting testimony related to gang affiliation and association by Appellant, Andino, and Jeter, as well as other Commonwealth witnesses at trial.

Based upon the above accounting, 1073 days (14+233+273+553) are excludable from the 1090 days between the filing of the criminal complaint on February 28, 2019, and the filing of Appellant's motion to dismiss on February 22, 2022. Thus, as of February 22, 2022, because of those significant adjustments to the mechanical run date evident on the face of the docket, the Pa.R.Crim.P. 600 clock had only moved forward 17 days since the filing of the criminal complaint. That said, even if the Commonwealth's continuance due to an unavailable witness from January 8, 2020, to February 5, 2020, (28 days) and its Superior Court of Pennsylvania brief extension from January 12, 2021, to February 10, 2021, (29 days) were to be considered a failure to exercise due diligence, those periods would amount to only 57 additional days, so the total amount of time since the filing of the criminal complaint chargeable to the Commonwealth was 74 days (17+57). The remainder of the 1090 days (1016 days) was attributable to Appellant and hence needed to be added to the mechanical run date to calculate the adjusted run date. Thus, even giving the benefit of the doubt to Appellant, the Commonwealth was, at the time of Appellant's motion to dismiss and also at the time of the trial, still within the adjusted timeframe to bring Appellant to trial.

While this Court acknowledges its error in failing to hold a hearing, Appellant suffered no resulting prejudice. Furthermore, the record clearly demonstrated that Appellant was brought to trial before the adjusted run date. Therefore, the trial

court's failure to hold a hearing was harmless error and Appellant is not entitled to relief on this issue.

## V. Whether the trial court erred by denying Defendant's motion in limine and admitted evidence of Defendant's gang affiliation and ties to New York City.

Appellant also raises an issue regarding the admission of evidence related to Appellant's gang affiliation and ties to New York City. In a Pre-Trial Motion *in limine,* Appellant argued that any evidence of his gang involvement would be unfairly prejudice and therefore the Commonwealth should be precluded from offering any testimony regarding such association. The decision to admit or exclude evidence is committed to the trial court's sound discretion. *Commonwealth v. Laird,* 988 A.2d 618, 636 (Pa. 2010); *Commonwealth v. Moser,* 999 A.2d 602, 605 (Pa. Super. 2010). The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. **Pa.R.E. 403.** An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather where the trial court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. *Commonwealth v. Gill,* 206 A.3d 459, 466–67 (Pa. 2019).

Following a hearing on this matter, the trial court entered an Order precluding any reference to anyone's association or affiliation with a gang. The Commonwealth appealed the Court's decision in an interlocutory appeal to the Superior Court. On February 14, 2022, the Superior Court vacated the trial court's ruling to exclude evidence of gang affiliation and remanded the matter back to the trial court. On remand, this Court entered an Order and Opinion dated April 21, 2022, holding that evidence of gang affiliation was relevant *res gestae* evidence for establishing the

33

background and context for the shooting as well as probative of Appellant's motive. (Attached hereto as Exhibit C.)

In its decision to remand, the Superior Court directed this court to consider whether the evidence of gang membership was admissible as a matter pursuant to Pa.R.E. 404(b) in light of a recent non-precedential decision in *Commonwealth v. Wilson*, 2020 WL 2315616, 237 A.3d 442 (Pa. Super. 2020). In *Wilson*, the Superior Court affirmed the trial court's finding that evidence of gang membership was admissible, in part, as *res gestae* evidence to explain the story of the Appellant's involvement in a shooting as well as a motive to commit the crime. Rule 404(b) of the Pennsylvania Rules of Evidence states in relevant part:

> **(b) Other Crimes, Wrongs, or Acts.**
> **(1) *Prohibited Uses.*** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) *Permitted Uses.*** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Pa.R.E.404(b)(1)-(2). The Superior Court opinion on remand also cited to cases in which Pennsylvania courts have permitted the admission of gang affiliation evidence for a variety of purposes. In *Commonwealth v. Childress*, 680 A.2d 1184 (Pa. Super. 1996.), the Court held that evidence of defendant's association with a drug organization was admissible to establish motive and to show the chain or sequence of events which became part of the history of the case and formed a part of the natural development of the facts. *Childress*, at 1188. Evidence of gang membership has also been admitted to explain the conduct of a Commonwealth witness. *Commonwealth v. Whitfield*, 419 A.2d 27, 29 (Pa. Super. 1980)(evidence of gang membership admissible to explain delay in reporting a crime).

34

After reconsidering the issue in accordance with the Superior Court of Pennsylvania's instructions, this Court permitted evidence regarding Defendant's ties to New York City and his membership in the Crips because the probative value of the evidence as *res gestae* and/or as motive was not outweighed by unfair prejudice. This Court nonetheless ordered precautions to safeguard against the unfair prejudice. Evidence of the alleged gang affiliation of Defendant, Jeter, and Andino was admitted at the trial of this matter with the following provisos: (1) the Commonwealth was prohibited from introducing evidence that Andino was requested to find accommodations for Defendant in Lebanon due to Defendant's involvement in a criminal act committed in New York, and (2) the Commonwealth was prohibited from introducing evidence of the rivalry situation between the gangs in the respective New York neighborhoods of Defendant and Jeter without laying a proper foundation for the admission of such evidence in accordance with this Court's order and opinion dated April 21, 2022. Additionally, evidence of the alleged drug dealings of Defendant and Andino was ruled inadmissible at the trial.

For the reasons set forth, this Court did not commit an abuse of discretion in its decision to admit evidence regarding Appellant's gang affiliation and ties to New York City. Therefore, Defendant is not entitled to relief on this issue.

VI.    **Whether the trial court erred by overruling Appellant's objection to the admission and publication of video depicting Appellant holding large sums of money.**

Appellant next argues the court erred by admitting a video obtained by Andino's cellphone depicting the Appellant wearing the distinctive red jacket. As stated previously, the decision to admit or exclude evidence is committed to the trial court's sound discretion. *Laird*, 988 A.2d 618 at 636; *Moser*, 999 A.2d 602 at 605. The threshold inquiry for the admission of evidence is whether the evidence is relevant. *Commonwealth v. Collins*, 888 A.2d 564, 577 (Pa. 2005). All relevant

35

evidence is admissible, except as otherwise provided by law. **Pa.R.E. 402.** Evidence is relevant if: (a) it has any tendency to make a fact of consequence more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. **Pa.R.E. 401;** *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021). A jury may infer consciousness of guilt upon finding that a Appellant intentionally altered his physical appearance for the purpose of avoiding identification. *Commonwealth v. Brown*, 676 A.2d 1178, 1183 (Pa. 1996). When a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis in connection with other proof from which guilt may be inferred. *Commonwealth v. Whack*, 393 A.2d 417, 419–20 (Pa. 1978).

All evidence offered by the prosecution will be prejudicial to the Appellant. *Commonwealth v. Peer*, 684 A.2d 1077, 1083 (Pa. Super. 1996). Were mere prejudice the standard, virtually all evidence could reasonably be excluded. *Id.* For this reason, the test for admissibility is whether the challenged evidence is so unfairly prejudicial that its inflammatory nature makes its probative value *de minimus. Id.* The court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the Appellant is charged. *Id.* Evidence will not be prohibited merely because it is harmful to the Appellant. *Commonwealth v. Dillon*, 925 A.2d 131, 141 (Pa. 2007).

At trial, Appellant objected to the video as being prejudicial because it showed the seventeen-year-old Appellant counting cash and "where is he getting a wad of money like that." (N.T., Trial, June 21, 2022, at 98.) The Commonwealth argued the video showed that the Appellant owned the jacket and therefore was highly probative evidence of his identity as the shooter. (N.T. 99.) The Commonwealth demonstrated that the video had significant and crucial probative value particularly, since as noted

36

by this Court, Appellant would not stipulate that the jacket depicted belonged to him. (N.T. 98.) Further, as a means to avoid unfair prejudice, the Commonwealth agreed, as suggested by this Court, that it would not state or imply the money in Appellant's hands came from illegal means, nor would it slow down the video or focus on the money in Appellant's hands. (N.T. 98-99.) Rather, the focus was on the face of Appellant and his wearing of the jacket linked to the murder. (N.T. 99.) After hearing arguments from both sides and noting that Appellant was not willing to stipulate ownership of the jacket, this Court indicated the video would be admitted. (N.T. 98-100.)

In this case, the identity of the shooter was at issue, and the Commonwealth's ability to prove that Appellant owned and regularly wore that jacket was probative of Appellant's identity as the shooter. Indeed, linking Appellant to ownership of the red jacket was critical to the Commonwealth's case for several reasons. First, Appellant's decision to abandon the easily identifiable jacket on a cold February night was evidence of his consciousness of guilt. Second, the discovery of the jacket corroborated Andino's testimony regarding Appellant's flight path, as the location where the jacket was discovered, the alley behind the Andino residence, was also the location of the ditched weapon used in the shooting. Finally, gunshot residue evidence on various areas of the jacket suggested that the jacket had been worn by someone who had recently discharged a firearm. Appellant's ownership of the jacket, then, was clearly a fact of consequence, and the video clip depicting Appellant wearing it for a period of time prior to the murder made that consequential fact more probable than it would have been without the evidence. Therefore, the video, was relevant and admissible, except as otherwise provided by law.

This Court found the video's probative value was not outweighed by the danger of unfair prejudice pursuant to Pa.R.E. 403. Additionally, this Court did not commit an abuse of discretion because the decision to admit the video was not a

37

conclusion which overrode or misapplied the law, was not a manifestly unreasonable judgment, and was not the result of partiality, prejudice, bias, or ill-will. Therefore, Appellant is not entitled to relief on this issue.

**VII.** **Whether the trial court erred in crafting a sentence in this matter by not considering the requisite statutory matters of the lack of criminal sophistication of the crime as well as Defendant's age, mental capacity, and lack of juvenile delinquency.**

Appellant also argued the trial court failed to consider the requisite statutory factors when it sentenced the Appellant to a term of fifty years to life imprisonment for his conviction of first-degree murder. Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006). In this context, an abuse of discretion is not shown merely by an error in judgment. *Id.* Rather, the defendant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. *Id.*

Under **18 Pa.C.S.A. Section 1102.1**, for convictions of first-degree murder committed at the time the defendant was a juvenile of fifteen years of age or older, the sentencing court must determine whether to sentence a defendant to a term of life imprisonment without parole or to a term of imprisonment with the minimum to be at least thirty-five years to life. **18 Pa.C.S.A. § 1102.1(a)(1).** In determining whether to impose a sentence of life without parole under **18 Pa.C.S.A. Section 1102.1(a)**, the court shall consider and make findings on the record regarding the following:

> **(1)** The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects

38

of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.

(2)     The impact of the offense on the community.

(3)     The threat to the safety of the public or any individual posed by the defendant.

(4)     The nature and circumstances of the offense committed by the defendant.

(5)     The degree of the defendant's culpability.

(6)     Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7)     Age-related characteristics of the defendant, including:

    (i)     Age.

    (ii)     Mental capacity.

    (iii)     Maturity.

    (iv)     The degree of criminal sophistication exhibited by the defendant.

    (v)     The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

    (vi)     Probation or institutional reports.

    (vii)     Other relevant factors.

**18 Pa.C.S.A. § 1102.1(d)**. Notably, nothing under this section shall prevent the sentencing court from imposing a minimum sentence greater than that provided in this section. **18 Pa.C.S.A. § 1102.1(e)**.

When imposing a sentence, the sentencing court must consider the factors set out in **42 Pa.C.S.A. Section 9721(b)**. *Commonwealth v. Shugars* at **1275**. These include the protection of the public, the gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant. **42 Pa.C.S.A. § 9721(b)**; *Commonwealth v. Shugars* at **1275**. Additionally, when imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. *Commonwealth v. Griffin*, **65 A.3d 932, 937 (Pa. Super. 2013)**. In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation. *Id.* While

39

a trial court judge has wide discretion in sentencing, the sentencing court must also consider the sentencing guidelines. *Commonwealth v. Shugars* at **1275**. Where the sentencing court has the benefit of a presentence investigation report, the Superior Court of Pennsylvania explained that it may assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. *Commonwealth v. Griffin* at **937**. Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code. *Id.*

This Court sentenced Appellant to a term of 50 years to life which is a term expressly permitted by **18 Pa.C.S.A. Section 1102.1(e)**. The Court imposed such a sentence with the benefit of the testimony and evidence produced at trial, a presentence investigation report, the sentencing guideline ranges, sentencing memoranda produced by both parties, reports from two mental health experts, a report from a school instructor at the Lebanon County Correctional Facility, comments from the victim's family, comments from counsel, and the statement from Appellant himself. (Notes of Testimony, Sentencing (hereinafter "N.T.S."), February 21, 2023, at 29.) This Court notes that neither Appellant's possible drug dealing nor his possible involvement in a shooting in New York were taken into consideration against Appellant at the time of sentencing. (N.T.S. 30.)

During the sentencing hearing, the Court commented on the relevant factors such as Defendant's age along with the impact on the victim's family. (N.T.S. 27.) In particular, as some examples of mitigating factors, the Court had considered Appellant's pursuit of a high school diploma, his increased desire to read, his service while incarcerated, the disagreement found between the expert reports, and his behavioral improvement on medicine. (N.T.S. 5-6, 25, 28, 30-31.) The Court also considered institutional reports from Lebanon County Correctional Facility and the gang lifestyle Appellant choose despite his family's efforts to intervene. (N.T.S. 18-

40

20, 23-27, 30-31.) The Court notes that Appellant's choice to continue his destructive lifestyle despite his family trying to help him as well as his lack of credibility caught this Court's attention. The Court also expressed concern that Appellant will relapse back to his destructive lifestyle if given the chance. (N.T.S. 16-20, 23-27, 30-31.) Similarly, this Court noted the disturbing fact that Appellant, who was a seventeen-year-old at the time of the shooting, seemed to be so used to his criminal lifestyle that he had no trouble sleeping after the shooting. (N.T.S. 27-28.)

A vast amount of information about Appellant was provided to this Court, and this Court did not fail to apply the information provided to Appellant's case. (N.T.S. 22, 27.) Therefore, Appellant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the Court is satisfied from its review of the Appellant's submitted Matters Complained of on Appeal that the Court did not err or abuse its discretion in denying Appellant a new trial or a Directed Verdict. The Court is also satisfied with its finding that Appellant did not receive ineffective assistance of counsel. As such, Appellant is not entitled to any relief sought.

# EXHIBIT A

ORIGINAL

**IN THE COURT OF COMMON PLEAS**
**OF LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
CLERK OF COURTS
LEBANON, PA

2020 AUG 18 P 4: 03

**CRIMINAL DIVISION**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : : : : | |
| v. | : : : | CP-38-CR-539-2019 |
| LINDLEY THELISMOND, Defendant | : : | |

**APPEARANCES:**

Pier Hess Graf, Esquire
District Attorney's Office

For Commonwealth

Kevin Dugan, Esquire

For Defendant

**OPINION BY JONES, J.:**

Before this Court is Defendant's Pretrial Motion to Suppress Evidence.

## I.  FACTUAL/PROCEDURAL HISTORY

On February 27, 2019, James Jeter died as a result of multiple gunshot wounds at approximately 10:20 p.m. at 1036 Orchard Avenue in Lebanon City. **Notes of Testimony (hereinafter "N.T.") 5/27/2020 P. 8**. The Lebanon City Police Department was dispatched to the address shortly after the incident after receiving reports of a homicide. **N.T. 5/27/2020 P. 8**. Richard Andino, the homeowner of 1036 Orchard Avenue and eyewitness to the crime, helped police identify the shooter through Facebook as Defendant, Lindley Thelismond. **N.T. 5/27/2020 P. 8-9**.

Police also used previous information obtained regarding Defendant to help identify him as the shooter. **N.T. 5/27/2020 P. 9**. In January of 2019, Officer Lieutenant Jonathan

2

Hess of the Lebanon City Police Department received a call from U.S. Marshals Deputy Gary Duncan. **N.T. 5/27/2020 P. 10.** Deputy Duncan advised Lieutenant Hess that he was in the Lebanon Area looking for Defendant. **N.T. 5/27/2020 P. 10.** Deputy Duncan stated Defendant was somewhere in the ten hundred block of Orchard Avenue and was wanted in connection with a shooting in New York City. **N.T. 5/27/2020 P. 10.** Later that month, the New York Police Department informed Lieutenant Hess that Defendant goes by the name of Lindley Escobar on Facebook. **N.T. 5/27/2020 P. 10.**

Around 3:00 a.m. on February 28, 2020, eyewitness Richard Andino agreed to call Defendant to help police locate him. **N.T. 5/27/2020 P. 11.** During the initial phone call, Mr. Andino spoke to Matthew Correa who was staying at 381 North 12th Street. **N.T. 5/27/2020 P. 11.** Mr. Correa indicated Defendant was currently at the 381 North 12th Street address. **N.T. 5/27/2020 P. 11.** Mr. Andino made a second phone call to Mr. Correa and spoke with Defendant. **N.T. 5/27/2020 P. 11.** The conversation with Defendant indicated he had in fact done the shooting. **N.T. 5/27/2020 P. 11.** At this point, Lieutenant Hess decided to travel to 381 North 12th Street to arrest Defendant. **N.T. 5/27/2020 P. 12.**

Upon arriving at the scene, Lieutenant Hess shouted loudly that it was the Lebanon City Police Department and that the occupants of 381 North 12th Street should exit the residence with their hands up. **N.T. 5/27/2020 P. 12.** The occupants began to exit the residence, including Mr. Correa and Jessica Bleecker. **N.T. 5/27/2020 P. 13.** Mr. Correa then informed Lieutenant Hess that a 9-year-old boy and Defendant were still in the home. **N.T. 5/27/2020 P. 13.** Lieutenant was fearful for the child's safety and did not want a hostage situation to develop. **N.T. 5/27/2020 P. 13.** At this point, he entered the residence through the rear entrance. **N.T. 5/27/2020 P. 13.**

Lieutenant Hess continued to shout instructions and moments later Defendant began to walk down the steps from the second floor. **N.T. 5/27/2020 P. 14.** Defendant complied with verbal commands and was taken into custody. **N.T. 5/27/2020 P. 14.** Defendant

3

indicated immediately that he wanted a lawyer and was immediately transported to the Lebanon Police Department. **N.T. 5/27/2020 P. 14.**

Once Defendant arrived at the Police Department, Sergeant Keith Uhrich performed a Sirchic Scanning Electron Microscopy Kit test (hereinafter "gunshot residue test") on Defendant's hands at approximately 5:08 a.m. **N.T. 5/27/2020 P. 39, 41.** Sergeant Uhrich did not obtain a search warrant to perform the test. **N.T. 5/27/2020 P. 42.** Due to the fragility of this evidence, Defendant's hands were quickly tested upon arrival before any potential residue washed or wore off his hands. **N.T. 5/27/2020 P. 40.** The test Sergeant Uhrich used came in a sealed container with four plastic stubs. **N.T. 5/27/2020 P. 40.** Sergeant Uhrich dabbed the four stubs across the top and bottom of each of Defendant's hands and the test was sent to the State Police Laboratory for testing. **N.T. 5/27/2020 P. 41.**

After Defendant was in custody, Lieutenant Hess spoke with Jessica Bleecker, a resident of 381 North 12th Street at that location. **N.T. 5/27/2020 P. 14.** Ms. Bleecker indicated that she and her 9-year-old son were the only individuals on the lease for the apartment. **N.T. 5/27/2020 P. 14.** Lieutenant Hess was concerned there may be firearms in the home with a child present. **N.T. 5/27/2020 P. 15.** Ms. Bleecker allowed Lieutenant Hess back into the residence and told police they could search her home. **N.T. 5/27/2020 P. 15.** Lieutenant Hess believed Ms. Bleecker's consent was sufficient to search the home and did not obtain a warrant. **N.T. 5/27/2020 P. 15.**

Ms. Bleecker informed Lieutenant Hess that Defendant stayed in a second floor bedroom. When Lieutenant Hess went to that bedroom, he found the door wide open. **N.T. 5/27/2020 P. 35.** Ms. Bleecker identified the items that belonged to Defendant. **N.T. 5/27/2020 P. 16.** Lieutenant Hess seized these items, which included a gray and black backpack and a clear plastic bag. **N.T. 5/27/2020 P. 20.** The bedroom also contained a large amount of general household goods that did not belong to Defendant. **N.T. 5/27/2020 P. 18.** There was also a mattress on the floor. **N.T. 5/27/2020 P. 29.**

4

The two items were brought back to the Lebanon City Police Department and secured in evidence storage. **N.T. 5/27/2020 P. 18.** Detective Fields obtained a search warrant before photographing the items within the bags. **N.T. 5/27/2020 P. 19.** Five bullets were found in the bags. **N.T. 5/27/2020 P. 21.** Four of the five bullets found matched the same caliber and model of gun found at the crime scene. **N.T. 5/27/2020 P. 21.**

On February 28, 2019, Defendant was charged with one (1) count of 18 § 2501 §§ A Criminal Homicide (F1). Defendant filed an Omnibus Pre-Trial Motion on November 8, 2019, to suppress evidence of the gunshot residue test and the warrantless search of the home. A hearing was held on the Motion on May 27, 2020. Both parties have submitted briefs on the issues and the matter is now ripe for disposition.

## II.   STANDARD OF REVIEW

The Rules of Criminal Procedure allow a defendant or the defendant's attorney to make a motion to the court to suppress any evidence alleged to have been obtained in violation of the defendant's rights. **Pa. R. Crim. P. 581.** When a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible and was not obtained in violation of the defendant's rights. **Pa. R. Crim. P. 581(H);** *Commonwealth v. Ruey*, 892 A.2d 802, 807 (Pa. Super. 2006). The suppression of evidence is only appropriate where a violation upon which the motion to suppress is based touches upon fundamental, constitutional concerns, was conducted in bad faith, or has substantially prejudiced the defendant. *Commonwealth v. Gentile*, 632 A.2d 573 (Pa. Super. 1993). Questions of credibility and the weight to be accorded to witness testimony are issues within the sound discretion of the trial court. *In re R.P.*, 918 A.2d 115 (Pa. Super. 2007).

## III. DISCUSSION

### A. Gunshot Residue Test

Defendant argues that the warrantless gunshot residue test was unlawful. Defendant states that upon arrest, he clearly requested to speak with an attorney. After he was in custody, Defendant argues the police had the ability to secure Defendant in a holding cell and should have obtained a warrant prior to performing the test on his hands. Defendant claims he had a clear privacy interest in his body and should be free from warrantless searches. As such, Defendant argues any and all evidence obtained as a result of the warrantless gunshot residue test of his hands should be suppressed.

The Commonwealth argues the test performed was a search incident to arrest and does not implicate significant privacy concerns. In addition, due to the fragility of the residue on Defendant's hands, a warrant was not necessary before performing the test. As such, the results of the gun residue test should not be suppressed.

In general, gunshot residue swab tests are admissible. *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016). In *Commonwealth v. Simonson*, the Court found the gunshot residue swab test to which the defendant was subjected incident to his arrest did not implicate significant privacy concerns. *Id.*; **U.S. Const. Amend. 4; Pa. Const. art. 1, § 8.** The Court went on to say that as the defendant had a reduced expectation of privacy as he was under lawful arrest supported by probable cause when the test was administered, the physical intrusion of the test was negligible. *Id.* In addition, the Court concluded the test was necessary for the promotion of the Commonwealth's legitimate governmental interests for ensuring public safety and welfare and preserving evidence for trial. *Id.*

Defendant argues that a warrantless search incident to arrest is valid only if "it is substantially contemporaneous with the arrest," and that the Commonwealth failed to prove that the test was performed at a time which was not too remote from the time of arrest to fulfill this requirement. We disagree with this contention.

At the pretrial hearing, Lieutenant Hess testified that once Defendant was taken into custody at the 381 North 12th Street location, he was immediately transported to the Lebanon Police Department. **N.T. 5/27/2020 P. 14.** Lieutenant Hess explained that he was not involved in the administration of the gun residue test on Defendant, but that he may have called the Lebanon Police Department from 381 North 12th Street to instruct Sergeant Keith Uhrich to perform the test when Defendant arrived at the station. **N.T. 5/27/2020 P. 32-33.** Sergeant Uhrich testified that he was at the police station when Defendant was taken into custody and brought back by other officers. **N.T. 5/27/2020 P. 39.** He explained that due to the fragile nature of gun powder residue, it was important that he conduct the testing as quickly as possible. **N.T. 5/27/2020 P. 40.** Sergeant Uhrich noted that the call for units for 381 North 12th Street came through EMA Computer Aided Dispatch at 4:51 a.m. and confirmed that the specimen was collected from Defendant immediately upon his arrival back at the station at 5:08 a.m. on February 28, 2019 before he was even taken to Central Booking. **N.T. 5/27/2020 P. 42-45.**

This case is factually similar to *Commonwealth v. Simonson*. Defendant was lawfully arrested in the residence. Lieutenant Hess had probable cause to arrest Defendant based on the previous information obtained from New York, the confirmation from eyewitness Richard Andino, and Defendant's proximity to the homicide. Once Defendant was in custody, there was a significant governmental interest in obtaining the evidence to confirm Defendant was the potential shooter and to preserve the fragile residue evidence before Defendant washed his hands or the residue wore off. In addition, the test was minimally invasive and only involved brief swabs to Defendant's two hands. We believe that this time frame is sufficiently contemporaneous with Defendant being taken into custody to constitute a search incident to his arrest for which no warrant was necessary. The test, which required the use of a kit which was located in the police station, was taken immediately upon Defendant's arrival at the police station. This was the first opportunity Sergeant Uhrich would have had to administer the test and it was completed as promptly

7

as possible under the circumstances. Therefore, the gunshot residue swab test results are admissible and will not be suppressed.

### B. Warrantless Search of the Home

Defendant argues the warrantless search of the home at 381 North 12th Street was not valid. Specifically, Defendant argues permission from Ms. Bleecker was not sufficient to search what Defendant claims was his personal bedroom. Due to the bedroom of the Defendant being in an area Defendant rented from the homeowner and a place of intimacy within the home, Defendant states there is a heightened expectation of privacy. As a result, Defendant claims the fellow renter had no legal authority to grant the police permission to search his room. Thus, Defendant argues, the search of the gray Nike backpack and the clear plastic bag found within the bedroom of the Defendant and any evidence obtained thereafter are fruits of the initial warrantless search of the bedroom and must be suppressed.

The Commonwealth argues that the search of the home and seizure of Defendant's bags was valid and a warrant was not required. The Commonwealth states that the consent of Ms. Bleecker was sufficient to search the room because the room in which the two small bags were found was not Defendant's bedroom and Ms. Bleecker had the authority to consent to the search. Second, the Commonwealth argues the situation justified the search and seizure of the bags. The Commonwealth states Lieutenant Hess was concerned there may be a firearm or weapons in the home. Based on this apprehension, Lieutenant Hess was justified in searching the room. Finally, the Commonwealth argues that regardless of whether the warrantless search and seizure of the bags from the room was valid, a warrant to search the bags was eventually obtained and the items seized would have eventually been discovered.

When performing a search incident to a lawful arrest, a police officer may conduct a warrantless search of an arrestee's person. *Commonwealth v. Ingram*, 814 A.2d 264 (Pa. Super. 2002). The fact that an arrestee has been brought under the control by the police does not, in itself, negate the need for a search incident to arrest; as long as it is reasonable

for an arresting office to believe that the individual arrested might be able to seize weapons or evidence from an area within his immediate control, that area may be searched incident to arrest. *Commonwealth v. Bess*, 382 A.2d 1212 (Pa. Super. 1978). Areas within an arrestee's immediate control may be searched to prevent danger to the officers and to prevent destruction of evidence. *Commonwealth v. Stanley*, 446 A.2d 583 (Pa. Super. 1982). A protective sweep incident to an arrest and conducted to protect the safety of police officers and others, is a well-recognized exception to the warrant requirement. *Commonwealth v. Potts*, 73 A.3d 1275 (Pa. Super. 2013). When arresting a defendant within a home, police officers can, as a precautionary measure and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched. *Commonwealth v. Taylor*, 771 A.2d 1261 (Pa. Super. 2001).

In this case, the search and seizure of the items within the second floor bedroom was not a search incident to a lawful arrest. While Lieutenant Hess had probable cause to arrest the Defendant within the home, the search of the upstairs bedroom was not within an area that would be considered a protective sweep or within Defendant's immediate control. Defendant walked down the stairs and was arrested on the main level. Defendant complied with the police commands and calmly exited the premises. A search of the main living area where Defendant was arrested would have been justified for police safety. However, specifically asking which bedroom is Defendant's, traveling to the second story of the house, and confiscating Defendant's backpack and bag does not fall under this exception.

In order to contest a search of property, a defendant must establish a legitimate expectation of privacy relating to the area search of the items seized. *Commonwealth v. Lowery*, 451 A.2d 245 (Pa. Super. 1982). To have reasonable expectation of privacy, one must intend to exclude others and must exhibit that intent. *Id.* A search warrant is not required ... where a person with the proper authority unequivocally and specifically consents to the search. *Commonwealth v. Reid*, 811 A.2d 530, 544 (Pa. 2002). A landlord

9

or lessor cannot consent to a search of the tenant's premises, regardless of the lessor's right to enter and inspect. *Lowery*, 451 A.2d at 247. However, a warrantless search may be made with the voluntary consent of a third party who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected. *Lowery*, 451 A.2d at 248; *United States v. Matlock*, 415 U.S. 164 172, 94 S.Ct. 988 (1974). Where joint access or control exists, there can be no reasonable or legitimate expectation of privacy. *Commonwealth v. Latshaw*, 392 A.2d 1301 (Pa. 1978). If police act on the consent of a third party who does not have actual authority to render such consent, evidence seized during the search is still admissible if the police reasonably, though mistakenly, rely upon that consent if the circumstances support their belief that they are acting reasonably and lawfully. *Commonwealth v. Blair*, 575 A.2d 593, 597 (Pa. Super. 1990).

In Defendant's Brief, he repeatedly refers to Lieutenant Hess's "mistake" in accepting Ms. Bleecker's consent. However, there was no evidence pointing to any mistake adduced at the hearing and we find none based upon the facts presented by the Commonwealth.

We first note that the evidence established that Defendant did not have an expectation of privacy within the bedroom. From prior police contacts, Lieutenant Hess had information linking Defendant to the Orchard Avenue residence where the shooting occurred. Ms. Bleecker informed Lieutenant Hess that she and her son were the only names on the lease of 381 12th Street. Although she indicated that Defendant had stayed in the bedroom, there was no indication that he was a resident of her household or a co-tenant. There was no clear evidence that Defendant paid rent to Ms. Bleecker or was subletting the room. There was no evidence that he resided there on a regular basis. While there was a mattress on the floor and two of Defendant's bags, there was no other indication that Defendant resided within the bedroom. The room was filled with various household goods not belonging to Defendant. **N.T. 5/27/2020 P. 18.** The door to the room was wide open.

10

**N.T. 5/27/2020 P. 35.** Defendant only had the two bags within the room; both contained socks, bullets, and a change of clothes.

We believe that Ms. Bleecker's consent to search the bedroom was sufficient for the seizure of the two bags belonging to Defendant as she had actual authority to render a valid consent. In *Commonwealth v. McCollum*, 602 A.2d 313 (Pa. 1992), it was held that the tenant of a property who paid the rent and lived there with her children had authority sufficient to validate her consent to a search which led to incriminating evidence against a houseguest. The evidence adduced at the pretrial hearing in this case indicate that Ms. Bleecker was the sole legal lessee of the premises. During the search, she pointed out only the two bags in the bedroom as belonging to Defendant. There was no dresser in the room to suggest Defendant's regular occupancy. No other items connected to Defendant were found in the entire house.

The police knew of Defendant's connection to the Orchard Avenue property and they were not required to take the time to consult with Ms. Bleecker's landlord or inspect the lease to determine whether her statement was true. There was no testimony as to any mistake on the part of the police at the hearing. Even if we were to accept Defendant's argument that the police were mistaken and that Ms. Bleecker's statement was not accurate, the facts would establish that she had the apparent authority to consent to the search. Moreover, if Defendant had established that he had some expectation of privacy, Ms. Bleecker would have still had at least common authority or a sufficient relationship to the bedroom to give a valid consent. However, as the Commonwealth established that Ms. Bleecker's consent was voluntarily given and Defendant did not have an expectation of privacy within the room, we find that the search was lawful and Defendant's motion to suppress these items will be denied.

Even if the search of the room was questionable, the items recovered would have inevitably been discovered. Under the inevitable discovery exception to the exclusionary rule, the fact that challenged evidence was obtained as a result of illegal government

11

conduct does not end the inquiry into whether the evidence was admissible at trial. *Commonwealth v. Gonzalez*, 979 A.2d 879 (Pa. Super. 2009). The exception provides that "evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence." *Commonwealth v. Ingram*, 814 A.2d 264 (Pa. Super. 2002). In other words, if the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, then the evidence is admissible. *Gonzalez*, 979 A.2d at 890; *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501 (1984).

In this case, even if the search of the room and seizure of the bags was illegal, police would have eventually discovered the items by lawful means. Defendant was already in custody and police on the premises when the room was searched. Instead of searching the room based on Ms. Bleecker's consent, police could have obtained a warrant before entering the bedroom and seizing the bags. As the items would have inevitably and lawfully been discovered, regardless of Ms. Bleecker's consent to search the room, the evidence is admissible.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Pre-Trial Motion is denied. Neither the gunshot residue test results nor the evidence obtained from the home shall be suppressed.

12